UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2012 JUL 12  PM 3: 24

CLERK

BY_____
DEPUTY CLERK

BRENDA BROWN and            )
EARL BROOKS,                )
individually and on behalf of  )
all others similarly situated,  )
                            )
        Plaintiffs,         )
                            )
    v.                      )        Case No. 5:10-cv-81
                            )
CITY OF BARRE, VERMONT,     )
                            )
        Defendant.          )

**OPINION AND ORDER**
**GRANTING IN PART AND DENYING IN PART**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND**
**PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT**
(Docs. 110, 114)

This matter comes before the court on the motion for summary judgment filed by Defendant City of Barre, Vermont (the "City") (Doc. 110) and the cross-motion for summary judgment filed by Plaintiffs Brenda Brown and Earl Brooks, individually and on behalf of all others similarly situated (Doc. 114). The court certified this as a class action on December 13, 2010, defining the class as "all tenants in the City of Barre, Vermont from February 17, 2007 to the present whose leases include City water paid for by the landlord/ratepayer and who have had or are at risk of having their water service disconnected by the City because their landlord/ratepayer's water bill was or is in default." (Doc. 69 at 13).

Plaintiffs assert claims under 42 U.S.C. § 1983, alleging that the City violated their constitutional rights in the actual or threatened termination of water service to them based upon their landlords' failure to make water payments to the City when due. As part of their constitutional challenge, Plaintiffs argue that Vermont's Uniform Water and Sewer Disconnect Statute ("Vermont's Disconnect Statute"), 24 V.S.A. §§ 5141-5151, is

constitutionally deficient.   The State of Vermont has filed an amicus brief, addressing this claim.[1]

Plaintiffs are represented by Christopher Curtis, Esq. and Karen L. Richards, Esq. Defendant is represented by Joseph A. Farnham, Esq. and Kevin J. Coyle, Esq.  The State of Vermont is represented by Assistant Attorneys General Megan J. Shafritz and Micaela Tucker.

## I.      The Undisputed Facts and the Operative Law.

### A.      Plaintiff Brenda Brown.

At the time she filed the initial Complaint, Plaintiff Brenda Brown lived at 74 Summer Street in Barre, Vermont, with her adult son and daughter-in-law.  Jeffrey and Mary Beth Tevis owned 74 Summer Street and were Plaintiff Brown's landlords. Plaintiff Brown paid $650 per month in rent to them, which she asserts included water service.  Plaintiff Brown's sole source of income is a monthly Supplemental Social Security check in the amount of $726.

During the relevant time period, the Tevises had an account with the City for water service.  The City sent bills to Mr. Tevis on a regular basis which included charges for the water used by Plaintiff Brown and all other tenants in the building.  The building had only one meter to measure the water usage for all tenants.

In April 2009, Mr. Tevis became delinquent in his payment of the water bill for 74 Summer Street.  The City sent Mr. Tevis a notice of delinquency on October 14, 2009, after his account had been delinquent for two quarters.  On October 18, 2009, Mr. Tevis

---

[1] In seeking dismissal of Plaintiffs' claims, the State argues that Plaintiffs have waived their procedural due process challenge to Vermont's Disconnect Statute by failing to raise that argument in their cross-motion for summary judgment.  Plaintiffs did in fact brief that issue albeit in a cursory manner.  *See* Doc. 114-1 at 32-33 (pointing out the "minimal to absent protections offered in the Uniform Disconnect Statute"); 36 (challenging Disconnect Statute's method of providing notice); and 39 (arguing that "Vermont Uniform Disconnect Statute . . . should be found to violate Plaintiff's procedural due process rights.").  They also clearly alleged a procedural due process challenge to the statute in their Second Amended Complaint and have given the State notice that they are challenging the constitutionality of the statute as required by FED. R. CIV. P. 5.1.  The State has fully briefed the claim and cites no prejudice that will occur if the court considers it.  Plaintiffs have therefore not waived their procedural due process challenge to Vermont's Disconnect Statute.

and the City entered into a repayment agreement, pursuant to which he made an initial payment of approximately $600 and was obligated to pay the city $150.92 per month plus current charges until his outstanding balance was paid in full. Mr. Tevis made regular payments until December 11, 2009, but made no payments thereafter.

On January 7, 2010, the City sent a letter by certified mail to Mr. Tevis, advising him that he had breached the repayment agreement, and offering him an opportunity to cure that breach by paying $150.92 under the repayment plan for the month of December, as well as the charges that had accrued after the Tevises failed to make the December payment. Plaintiff Brown did not receive a copy of this letter.

On January 19, 2010, Plaintiff Brown received a hand-delivered notice from the City advising that water service to 74 Summer Street would be disconnected the following day due to her landlord's default. The notice was addressed to the Tevises and advised that payment of $571.57 was required by the close of business that day to prevent water service termination. Plaintiff Brown contacted the City to ask how she could maintain water service. She was told that she could pay $571.57 immediately, plus $150.92 representing the amount due under the repayment plan. The City's policy is that continuation of water service is predicated on payment of any arrearages irrespective of who pays the arrearages. The City informed Plaintiff Brown that she could not establish a new account in her own name because she was not the property owner. Plaintiff Brown was unable to afford the required payments, and her water service was disconnected on January 20, 2010. Plaintiff Brown made a written request for a hearing regarding the disconnection, but the City denied that request because she was not a "ratepayer."

Later in the day on January 20, 2010, the City reconnected water service to 74 Summer Street due to an erroneous belief that water was required for the heating system in the building. Plaintiff Brown informed the City that she received her Social Security check on the first of every month and that, on February 1, 2010, she would pay the Tevises' bill. She did not pay the bill on that date. Plaintiff Brown attempted to contact Mr. Tevis but was unsuccessful. On February 3, 2010, the City again disconnected water service to 74 Summer Street.

3

The next day, on February 4, 2010, Plaintiff Brown underwent foot surgery and was discharged the same day. Because she had no running water in her apartment, she was forced to carry water upstairs to cook, clean, and flush the toilet. Plaintiff Brown also required water to care for the surgical site on her foot. After approximately two weeks without water service, Plaintiff Brown obtained a state court injunction requiring the City to restore water service. The state court injunction was based on a physician's certificate stating that Plaintiff Brown had a medical problem which required access to water. The state court ordered the City to continue water service to Plaintiff Brown, provided she paid for her actual usage, with the understanding that the City would continue to bill Mr. Tevis. At that time, Plaintiff Brown was the only tenant living at 74 Summer Street.[2]

### B.    Plaintiff Earl Brooks.

Plaintiff Earl Brooks lives with his wife at an apartment located at 37 Summer Street in Barre, Vermont which he rents from Barrett Gregoire, the building's owner, for $650 per month. Plaintiff Brooks claims that he agreed with Mr. Gregoire's representative that rent would include water usage. The City regularly sent bills to Mr. Gregoire that included charges reflecting the amount of water used by Plaintiff Brooks and all other tenants in the building. The building has only one meter measuring water usage for all tenants. Mr. Brooks's sole source of income is a monthly Supplemental Social Security check in the amount of $726.04.

As of January 1, 2010, Mr. Gregoire's account was approximately $460 in arrears. The City sent a notice of delinquency letter to Mr. Gregoire on April 20, 2010, after his account had been delinquent for two quarters. On May 12, 2010, Plaintiff Brooks received a hand-delivered notice from the City stating that water service would be disconnected the following day due to Mr. Gregoire's default. The notice advised that payment in the amount of $1,238.39 must be made to avoid disconnection. When Mr.

---

[2] During this time period, 74 Summer Street was subject to a foreclosure proceeding. A judgment of foreclosure was entered against the Tevises on March 8, 2010. Plaintiff Brown moved out of her apartment on September 1, 2010, because of the foreclosure.

Brooks contacted the City, he was told that the City was only dealing with Mr. Gregoire regarding water service for the building. Thereafter, Mr. Gregoire entered into a payment plan with the City, made monthly payments, and water service to his apartment building was not disconnected.[3]

### C.   Vermont's Statutory Scheme Governing Water Service.

Vermont law requires a rental dwelling unit to be "safe, clean and fit for human habitation" including the provision of "an adequate amount of water." 9 V.S.A. § 4457. Vermont's Rental Housing Health Code states that "every dwelling unit . . . shall be connected to: a supply of water sufficient in quantity and pressure to meet the ordinary needs of the occupant(s)." Vt. Code R. § 111(D)(1). Vermont law authorizes and empowers municipalities to provide such water service "and distribute the same through such municipal corporation for the purpose of supplying the inhabitants thereof with water for fire, domestic and other purposes." 24 V.S.A. § 3301.

When a municipality supplies water to a rental dwelling unit, Vermont law imposes a number of statutory requirements. First, Vermont's Water Works Statute imposes personal liability upon the actual user of a municipality's water service for the cost of water used, stating "[t]he owner or occupant of any tenement, house, or building, who takes the water of [a] municipal corporation shall be liable for the rent or price of the same[.]" 24 V.S.A. § 3306. In the event of nonpayment, "[t]he charges, rates or rents for water shall be a lien upon the real estate furnished with the municipal corporation water in the same manner and to the same effect as taxes are a lien upon real estate." *Id.* If water bills "remain unpaid more than two years after the creation of such lien, such lien may be foreclosed in the same manner as provided by law for the foreclosure of mortgages on real estate." 32 V.S.A. § 5061(b).

Second, Vermont's Disconnect Statute authorizes municipalities to disconnect water service "as a delinquency collection procedure." 24 V.S.A. § 5141. "Disconnection" is defined as "the deliberate interruption or disconnection of water . . .

---

[3] 37 Summer Street was subject to foreclosure proceedings at the time the water service account went into arrears, which culminated in a foreclosure.

service . . . to a ratepayer by the servicing municipality for nonpayment of water . . . charges." 24 V.S.A. § 5142(2). "Delinquency" is defined as the "failure of the ratepayer to tender payment for a valid bill or charge." 24 V.S.A. § 5142(3). The Disconnect Statute does not define the term "ratepayer."

A "ratepayer" may avoid water service termination pursuant to several statutory exceptions which include delinquencies of less than fifteen dollars; charges that are the subject of a pending appeal; a delinquency due only to nonrecurring charges (such as the provision of a deposit); if the ratepayer had not been "given an opportunity to enter into a reasonable agreement to pay the delinquent bill, or having made such agreement, has abided by its terms;" and where disconnection would represent "an immediate and serious hazard to the health of a ratepayer or a resident within the ratepayer's household, as set forth in a physician's certificate which is on file with the municipality." 24 V.S.A. § 5143(b). The Disconnect Statute requires notice to both the occupant and the "ratepayer" prior to disconnection:

> No municipality shall disconnect service to a ratepayer unless payment of a valid bill or charge is delinquent as defined herein, and notice of disconnection has been provided previously to the ratepayer. A copy of the notice shall be sent to the occupant of a residential dwelling which will be affected by the disconnection if the occupant is different than the ratepayer.

24 V.S.A. § 5143(a). The form of notice must be clearly printed on a pink colored sheet of paper and set forth the following information:

<div style="margin-left:2em">

Date

_____

$_____

AMOUNT IN ARREARS

</div>

Dear Customer:

According to our records, your (water) (sewer) service account is still unpaid. Please make full payment of the account or contact our office to make satisfactory arrangements before _____. If this is not done, we will no longer be able to extend credit and will have to discontinue your service, on that day or any one of the following four business days. (Under the law, "Business days" means Monday through Thursday, excluding legal

holidays, when the offices are not open to the public). An unpaid bill is a lien on your real property, and may lead to tax sale proceedings.

SPECIAL CHARGES--Section 5151 of Title 24, Vermont Statutes Annotated, provides that we charge a fee for coming to your location to collect the amount overdue. Also, the same statute provides that we shall charge a reconnection fee for restoration of service if your service has been disconnected for nonpayment. These fees are as follows:

Collection Trips--$25.00, regardless of number
Reconnection--Normal Hours--$25.00
Overtime--$37.50
Interest according to 32 V.S.A. § 5136(a)

If payment has already been sent, we recommend that you contact our office to make certain that payment is recorded on your account by the indicated date as such payment may have become delayed or lost in the mail. Payment in the mail does not constitute payment until received by us.

THIS IS A FINAL REQUEST FROM:

(Name of Credit Supervisor)
(Name of Municipality)
(Address of Municipality)
(Town)
Vermont (Zip Code)
(Telephone Number)

OTHER IMPORTANT INFORMATION--If you have a question concerning this bill or if you want to seek an agreement with us to pay the balance due in partial payments over a period of time, you should contact this office as soon as possible after receipt of this notice. In the event an agreement is entered into, failure to abide by the terms of agreement can lead to disconnection without further notice. If disconnection would result in an immediate and serious health hazard to you or to a resident within your household, disconnection will be postponed upon presentation of a duly licensed physician's certificate.

APPEALS--If you cannot reach agreement as to payment of this bill with the credit supervisor whose name appears above, you may appeal to:

(Name of Chairman of the Local Legislative Body)
(Name of Town, City or Village)

(Address of Office)
(Mailing Address)
or by calling:
(Telephone Number)

An appeal cannot be taken unless you first attempt to settle with the credit supervisor. You may appeal only as to the proper amount of your bill or the correctness of application of the rules and regulations. You may not appeal as to the level or design of the rates themselves. No charge shall be made for the appeal. However, undisputed portions of the charges giving rise to this notice must be paid before the disconnection date given above.

24 V.S.A. § 5144.

The Disconnect Statute requires at least fourteen days' notice prior to a disconnect, 24 V.S.A. § 5142(5),[4] and permits an appeal from a disconnect by only the "ratepayer" to a municipal selectboard or hearing officer:

The selectboard shall promptly and fairly hear any or all appeals by the ratepayer after notice to all interested parties. During appeal, disconnection will be postponed. Upon just cause shown, the selectboard may grant exceptions to any ratepayer. The selectboard may appoint one or more members of the selectboard to act as hearing officers for the purposes of the appeal. Alternatively, the selectboard may appoint a responsible citizen to act as a hearing officer for the appeal.

24 V.S.A. § 5147.

The Disconnect Statute requires the municipality to restore water service when an agreement is reached with the "ratepayer." 24 V.S.A. § 5146. The Disconnect Statute contains no provision pursuant to which anyone other than a "ratepayer" may obtain a restoration of service.

The person who actually disconnects service must do so only between the hours of 8:00 a.m. and 2:00 p.m. "of the business day specified on the notice of disconnection, or within the same hours during the four business days thereafter," 24 V.S.A. § 5145(a), and

---

[4] As defined by the Vermont Disconnect Statute, "'[n]otice' means the written notice on the form prescribed in section 5144 of this chapter, sent within 40 days after delinquency and postmarked and sent not more than 20 days, nor less than 14 days prior to the disconnect of service." 24 V.S.A. § 5142(5).

8

shall "immediately inform a responsible adult on the premises that service has been disconnected or interrupted, or if no responsible adult is then present, shall leave on the premises in a conspicuous and secure place a notification advising that service has been disconnected or interrupted and what the ratepayer has to do to have service restored." 24 V.S.A. § 5145(b).

Although a municipality may adopt "further procedures, ordinances, or rules providing greater protection for consumers" than is required by Vermont's Disconnect Statute, 24 V.S.A. § 5148, there is no authority to provide less.

### D.   The City's Charter and Water Ordinance.

The City is a municipal corporation whose Charter states that "[t]he [C]ity shall have all of the powers granted to towns and municipal corporations by the constitution and laws of [the State of Vermont] . . . it may enact ordinances not inconsistent with the constitution and laws of the State of Vermont or this charter[.]" 24 V.S.A. § 1-104(a). The Charter further provides that: "The city of Barre is authorized and empowered to provide a suitable supply of water for the city and the inhabitants that live along or near its line of pipes in other municipalities, against fire and for sanitary, domestic, and general industrial uses, beneficial to the public[.]" 24 V.S.A. App. § 1-507.

The City implements its water supply services through its Water and Sewer Ordinance (the "Ordinance") which requires that new applications for water service be "signed by the owner of the premises to be supplied." Ordinance § 19-23(b). The Ordinance further provides that, "the water department . . . in furnishing water . . . shall deal only with [the] owner of the premises." *Id.* § 19-24. The Ordinance requires "the owner of any premises desiring to use city water [to] keep the water department advised, in writing[,] of the address to which all bills, notices and other communications to him [are to be] delivered." *Id.*

The Ordinance allows the City to "withhold the water supply from any person failing or refusing to comply with any of [its] provisions or requirements . . . or the regulations of [the water service] department approved by the council," *id.* § 19-36(a), and treat such failure or refusal as "a relinquishment of all right to use city water." *Id.*

9

Prior to a termination of water service, the "user of water on the premises in question" must be given "not less than three (3) days['] notice." *Id.* § 19-36(b).

The City has adopted the federal housing quality standards set forth in 24 C.F.R. § 982.401 as the City's "Minimum Rental Housing Standards." Barre City Ordinances, § 7-6(b)(1) ("The federal housing quality standards § 982.401 shall be adopted as the minimum housing standards for the City of Barre[.]"). The adopted federal standards impose several mandatory requirements related to water service, including the requirement that the unit "be served by an approved public or private water supply that is sanitary and free from contamination," 24 C.F.R. § 982.401(i)(2), "have a fixed basin in proper operating condition, with . . . hot and cold running water," 24 C.F.R. § 982.401(b)(2)(ii), "have a kitchen sink . . . with . . . hot and cold running water," 24 C.F.R. § 982.401(c)(2)(ii), and have a "flush toilet in proper operating condition." 24 C.F.R. § 982.401(b)(2)(i).

### E.     The City's Water Service Policies and Practices.

The City's municipal water service is the sole source of piped potable water in Barre. Water service bills are sent only to the "ratepayer" including notices of defaults. There is a base rate for water and service of approximately $80 per quarter (or $320 per year) that must be paid as a "ready to serve" charge even if no actual water is used.

The City's shutoff notices for water service are set forth on the City's letterhead with the heading "FINAL NOTICE' in bold font with large capital letters. In large font, the notice provides the name of the landlord and a street address and advises the following:

> Your Water Service is scheduled to be <u>DISCONNECTED</u> on [date--three days after handprinted date on notice], for your outstanding Delinquent Water/Sewer Bill.
>
> A payment in the amount of $ ____, must be made to the Delinquent Tax Collector no later than the close of business (4:30 p.m.) on [date--one day before anticipated disconnect] in order to avoid disconnection.
>
> Once Water Service has been disconnected a Reconnection Fee of <u>$25.00</u> will be charged to have your Water Service restored. If Water Service is

restored after hours (2:30 p.m. to 8:30 p.m.), a Reconnection Fee of $37.50 will be charged.

Payment must be made directly to the Delinquent Tax Collector at the City Hall. [phone number].

(Doc. 114-5 at 10-12.)

It is the City's standard practice to post the Final Notice at the property itself. It is also the City's standard practice to make handwritten notes on the notices when they are filed in order to keep the City informed of the status of the account and any communications with property owners. If water service is terminated, the City provides a written notice to the property owner. This notice sets forth the monetary amount required to restore service and where, how, and when it may be paid. It contains no information regarding a right to a hearing or appeal, the right to a repayment plan, or the right to seek a medical condition exception. *See, e.g.*, Doc. 119-1 at 7. It is not the City's practice to verbally advise ratepayers of their right to a hearing or an appeal.

If a landlord defaults on a payment arrangement, water service may be disconnected immediately. Since at least March of 2008, the City has never attempted to place a lien on property for the express purpose of collecting a delinquent water account.

The City receives approximately five requests per year from tenants who wish to establish water service in their own names. The City generally does not allow tenants to establish a water service account in their own name because they are not the property owners, however, it has granted two such requests: one for Brenda Brown pursuant to the state court injunction and another for a tenant who sought abatement of a water bill which resulted in a separate payment arrangement. The City has only received one request for an appeal or hearing, made by Brenda Brown, which was denied.

The City is willing to accept money from anyone, including tenants, to bring a water service account current. If water service is disconnected, a tenant may obtain reconnection by paying his or her landlord's outstanding water bill and a reconnection fee. In order to establish water service on a continued basis in the future, the tenant must

further agree to pay his or her landlord's water service account going forward or assume the obligations under the landlord's repayment plan.

The City's rationale for dealing only with ratepayers and not tenants includes "administrative convenience (it is much easier to deal with the identifiable and certain group of property owners rather than the unknown and frequently changing tenants) and financial responsibility (property owners have a greater stake in their property)." Doc. 110-1 at 3-4.

### F.   Plaintiffs' Constitutional Claims.

In Count One of their Second Amended Complaint, Plaintiffs allege a claim under 42 U.S.C. § 1983 based upon a violation of their procedural due process rights by virtue of the City's Ordinance and Vermont's Disconnect Statute which they allege fail to provide adequate pre-deprivation or post-deprivation protection of their right to water service.

In Count Two, they initially alleged a claim under § 1983 for violation of their right to substantive due process by virtue of the provisions in the City's Ordinance and Vermont's Disconnect Statute which they claim effectively coerce Plaintiffs and other class members into paying the debts of actual ratepayers in order to avoid water service termination. They contend such provisions are not rationally related to a legitimate governmental purpose. In their Supplemental Memorandum of Law, Plaintiffs withdraw their challenge to Vermont's Disconnect Statute on substantive due process grounds. *See* Doc. 123 at 1 ("Plaintiffs do not assert a challenge to the statute on substantive due process or equal protection grounds.").

In Count Three, Plaintiffs allege a claim under § 1983 for violation of the rights to Equal Protection because both the City's Ordinance and Vermont's Disconnect Statute treat tenants whose landlords are in default differently than tenants whose landlords who are not, and property owners differently from tenants, based solely upon a desire for convenience in debt collection which is not a rational basis for disparate treatment. As noted, Plaintiffs have abandoned their equal protection challenge to Vermont's Disconnect Statute. *See id.*

In their prayer for relief, in addition to seeking individual damages and injunctive relief, Plaintiffs ask the court to declare that the City's Ordinance either violates state law and/or is unconstitutional on its face and as applied to Plaintiffs. They further ask the court to declare 24 V.S.A. §§ 5143, 5145-5147 unconstitutional and void on their face and as applied to Plaintiffs.

## II.   Conclusions of Law and Analysis.

### A.   Standard of Review.

Summary judgment must be granted when the record shows there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotations and citation omitted). In deciding the motion, the trial court must resolve all ambiguities and draw all reasonable inferences in favor of the non-moving party, and deny the motion if a rational juror could decide in favor of that party under the applicable law. *Scott v. Harris*, 550 U.S. 372, 378 (2007). "There is no material fact issue only when reasonable minds cannot differ as to the import of the evidence before the court." *Commander Oil Corp. v. Advance Food Serv. Equip.*, 991 F.2d 49, 51 (2d Cir. 1993).

The standard does not change when the parties file cross-motions for summary judgment. In such cases, "the court 'must evaluate each party's motion on its own merits taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.'" *Bronx Household of Faith v. Bd. of Educ. of City of New York*, 492 F.3d 89, 96 (2d Cir. 2007) (quoting *Hotel Emps. & Rest. Emps. Union, Local 100 v. City of New York Dep't of Parks and Recreation*, 311 F.3d 534, 543 (2d Cir. 2002)).

**B.      The Essential Elements of a Claim under 42 U.S.C. § 1983.**

In order to prevail on a claim against a municipality under 42 U.S.C. § 1983, Plaintiffs must establish (1) actions taken under color of law; (2) a deprivation of a constitutional or statutory right; (3) causation; and (4) damages. *See Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008); *Hollander v. Copacabana Nightclub*, 624 F.3d 30, 33 (2d Cir. 2010).

In this case, the City does not dispute that it was acting under the color of law when it terminated or threatened to terminate Plaintiffs' water service as a result of nonpayment by Plaintiffs' respective landlords. The court thus turns to examine the remaining elements of Plaintiffs' three constitutional claims.

**C.      Plaintiffs' Procedural Due Process Claims.**

Plaintiffs allege a violation of the Fourteenth Amendment based upon both Vermont's Disconnect Statute and the City's Ordinance and water services policies and practices, claiming each deprived Plaintiffs of a protected property interest in water service without due process of law. The City claims that no protected property interest may be found in water service and that, as a result, no procedural due process must be afforded to Plaintiffs. In the alternative, it argues that even if the court finds a protected property interest in water service, Vermont's Disconnect Statute and the City's Ordinance afford Plaintiffs all the process which they are due. The State contends that regardless of whether Plaintiffs have a protected property interest in water service, the Disconnect Statute meets or exceeds procedural due process requirements.

"The Fourteenth Amendment places procedural constraints on the actions of government that work a deprivation of interests enjoying the stature of 'property' within the meaning of the Due Process Clause." *Memphis Light, Gas and Water Div. v. Craft*, 436 U.S. 1, 9 (1978). In determining whether Plaintiffs have established a violation of procedural due process, the court considers first whether Plaintiffs have been deprived of a protected property interest. If so, the court determines what process was due to protect that interest. *See Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 429 (1982) ("At the outset, then, we are faced with what has become a familiar two-part inquiry: we must

14

determine whether Logan was deprived of a protected interest, and, if so, what process was his due.").

### 1. Whether Plaintiffs Establish a Protected Property Interest.

The Supreme Court has held that constitutionally protected property rights are determined by reference to "an independent source such as state law--rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972); *Perry v. Sindermann*, 408 U.S. 593, 601-602 (1972) (holding that property interest can derive from express or implied contracts); *Goldberg v. Kelly*, 397 U.S. 254, 262 (1970) (concluding that property interest in welfare benefits is "a matter of statutory entitlement for persons qualified to receive them"); *Golden v. City of Columbus*, 404 F.3d 950, 955 (6th Cir. 2005) (recognizing "two bases for such non-unilateral legitimate claims of entitlement: state statutes and contracts, express or implied, between the complaining citizen and the state or one of its agencies."). "Although the underlying substantive interest is created by 'an independent source such as state law,' federal constitutional law determines whether that interest rises to the level of a 'legitimate claim of entitlement' protected by the Due Process Clause." *Craft*, 436 U.S. at 9. A protected property interest "may take many forms" and "extends well beyond actual ownership of real estate, chattels, or money[.]" *Roth*, 408 U.S. at 576, 571-72. It must, however, have "some ascertainable monetary value." *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 766 (2005) (citation omitted).

In order for Plaintiffs to assert a property interest in water service, they must show "more than an abstract need or desire for it. [They] must have more than a unilateral expectation of it. [They] must, instead, have a legitimate claim of entitlement to it." *Roth*, 408 U.S. at 577 (1972). "Where the administrative scheme does not require a certain outcome but merely authorizes particular actions and remedies, the scheme does not create 'entitlements' that receive constitutional protection under the Fourteenth Amendment." *Sealed v. Sealed*, 332 F.3d 51, 56 (2d Cir. 2003). Where the state has significant discretion regarding whether a particular benefit will be conferred, a potential

15

recipient of the benefit will only in "the rare case . . . be able to establish an entitlement to that benefit." *Kelly Kare, Ltd. v. O'Rourke*, 930 F.2d 170, 175 (2d Cir. 1991).[5]

Plaintiffs advance a two-pronged argument to support their claim that a tenant has a protected property interest in water service under Vermont law. First, they claim a right based on contract, and second, they claim a statutory entitlement. The City counters that Plaintiffs have no protected property interest in water service and thus no procedural due process protection is required. The State demurs on this issue, asserting "[t]he Court need not decide in this case whether Plaintiffs have a protected property interest in continued water service because, even if they do, the statute affords adequate notice and opportunity for hearing." (Doc. 117 at 45.)

Because each of Plaintiff's constitutional claims depends upon the court finding a protected property interest, the court cannot avoid this inquiry even in the context of Plaintiffs' procedural due process claim. *See Harrington v. County of Suffolk*, 607 F.3d 31, 34 (2d Cir. 2010) ("To state a claim for deprivation of property without due process of law, a plaintiff must identify a property interest protected by the Due Process Clause"). The court thus examines Plaintiffs' claimed sources of their alleged protected property interest seriatim.

### i.      Contractual Right to Water Service.

Courts that have found a protected property interest in water service based upon an express or implied contract have generally required a direct contractual relationship between the claimant and the municipality. *See, e.g., Mansfield Apartment Owners Ass'n*

---

[5] The parties dispute whether the Second Circuit's "strict entitlement" standard applies to this case. That standard requires an applicant for a license to establish that absent the alleged denial of due process, there is either certainty or a very strong likelihood that the application would have been granted. *Yale Auto Parts, Inc. v. Johnson*, 758 F.2d 54 (2d Cir. 1985). The standard is intended to protect federal courts from being "overburdened . . . beyond capacity" by an aggrieved applicant challenging "every proceeding in which he is denied a license or permit." *Id.* at 59. The Second Circuit, itself, has noted "ambiguity" regarding whether the standard "applies outside the land use context in which it originated." *Kapps v. Wing*, 404 F.3d 105, 116 n.14 (2d Cir. 2005). In *Craft*, the Supreme Court did not impose a "strict entitlement" test. The court thus declines to apply it here although it notes that the outcome of this case would not be altered by a "strict entitlement" test.

*v. City of Mansfield*, 988 F.2d 1469, 1474 (6th Cir. 1993) (holding that property owners' expectation of continued utility service based upon accounts with municipality established a "'legitimate claim of entitlement' encompassed in the category of property interests protected by the due process clause."); *Golden*, 404 F.3d at 956 ("Without evidence of a contractual relationship between Golden and the City, or of a statutory entitlement to water service," procedural due process protection is not available); *Sterling v. Village of Maywood*, 579 F.2d 1350, 1354 (7th Cir. 1978) (finding no protected contractual interest because plaintiff had no contractual relationship with water department and "plaintiff makes no claim that a de facto understanding existed between her and the Village. Thus, there was no implied property right.").

Plaintiffs in this case concede that they have no direct contractual relationship with the City, but nonetheless contend they are the intended third-party beneficiaries of the contracts between their respective landlords and the City. They point out that performance under the agreement between their landlords and the City is rendered directly to them as the recipients of water service with the expectation that they will use the water. They further point out that their landlords have a statutory obligation to provide them with water service pursuant to Vermont's Residential Rental Agreements Act, 9 V.S.A. § 4457.

Vermont has adopted THE RESTATEMENT (SECOND) OF CONTRACTS to determine whether a person is an intended third-party beneficiary of a contract between other parties:

> "[A] beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either (a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance."

*Herbert v. Pico Ski Area Mgmt. Co.*, 2006 VT 74, ¶ 15, 180 Vt. 141, 908 A.2d 1011 (quoting RESTATEMENT (SECOND) OF CONTRACTS § 302(1) (1981)); *see also Morrisville Lumber Co., Inc. v. Okcuoglu*, 531 A.2d 887, 890 (Vt. 1987) ("Whether or not a party is a

third-party beneficiary is based on the intention of the original contracting parties."); *Wells Fargo v. Sinnott*, 2009 WL 3157380, at *11 (D. Vt. August 17, 2009) ("The determination of whether a party may be classified as a third-party beneficiary, as opposed to an incidental beneficiary, is based on the original contracting parties' intention.").

Here, Plaintiffs proffer no evidence of their respective landlords' contractual intent, no document reflecting such intent, and no evidence of the account or contract between their respective landlords and the City. In the absence of such evidence, it appears that Plaintiffs' respective landlords only contract with the City to provide water service to a particular building, and not to particular tenants. This cuts against a finding that Plaintiffs are the intended beneficiaries of their landlords' water service accounts. *Cf. Flickinger v. Harold C. Brown & Co.*, 947 F.2d 595, 600 (2d Cir. 1991) ("Here, BBSI contracted with Brown to provide clearing and other services for Brown's clients. Flickinger, as one of Brown's clients, was precisely the intended beneficiary of BBSI's contract with Brown. In fact, BBSI's breach of its obligations under that contract . . . involved performance that was to be rendered directly to Flickinger.").

Moreover, Plaintiffs concede, as they must, that far from intending to confer any enforceable rights upon them, the City, through its Ordinance, seeks to avoid all obligations to tenants for water service and affirmatively states that it will provide water service "for meter use only." Ordinance § 19-23. There is thus insufficient evidence before the court that *either* of the original contracting parties intended to confer upon Plaintiffs the benefit of their promised performance. At best, Plaintiffs have established that if both the City and their respective landlords performed as intended, Plaintiffs would be the recipients of continued water service. Intended third-party beneficiary status is not created on this basis. *See McPheeters v. McGinn, Smith and Co., Inc.*, 953 F.2d 771, 773 (2d Cir. 1992) ("A third-party beneficiary exists, however, only if the parties to that contract intended to confer a benefit on him when contracting; it is not enough that some benefit incidental to the performance of the contract may accrue to him.") (internal quotations and citations omitted); *McCarthy v. Azure*, 22 F.3d 351, 362 & n.16 (1st Cir.

1994) ("Because third-party beneficiary status constitutes an exception to the general rule that a contract does not grant enforceable rights to nonsignatories . . . a person aspiring to such status must show with special clarity that the contracting parties intended to confer a benefit on him. . . . These requirements are not satisfied merely because a third party will benefit from the performance of the contract.").

Courts have specifically rejected intended third-party beneficiary status based upon facts similar to those advanced by Plaintiffs. *See, e.g., Midkiff v. Adams Cty. Reg. Water Dist.*, 409 F.3d 758, 768 (6th Cir. 2005) (rejecting tenants' intended third-party beneficiary argument where water district rules "fail to recognize any right of non-owners to seek service or to enforce the property owner's rights under the . . . contract" and tenants submitted no evidence of contracting parties' intent to benefit them); *Williams v. V.I. Water & Power Authority*, 672 F.2d 1220, 1228 (3d Cir. 1982) (rejecting tenant's intended third-party beneficiary argument for enforcement of electricity contract between landlord and utility company where "there was no evidence at all as to the intent of either party to the contract"). The court finds their conclusions on this issue persuasive.

In the alternative, Plaintiffs make a relatively novel argument that because Vermont's landlord-tenant law requires a landlord to provide water service to a dwelling unit, 9 V.S.A. § 4457, this statutory obligation sets in motion a chain of events that confers intended third-party beneficiary status upon tenants. *See* Doc. 114-1 at 20 ("Here, the City of Barre's provision of water service to a tenant's residence constitutes its performance under its contract with the tenant's landlord. This performance, in turn, satisfies the landlord's obligation to his tenants to provide such water service. Non-ratepayer tenants thereby satisfy the definition of a third-party beneficiary[.]"). The problem with this argument is that it dispels the need to establish the contracting parties' intent which is the touchstone of intended third-party beneficiary status. *See Sinnott*, 2009 WL 3157380, at *12 (recognizing the "universal concept that third party beneficiary status must be intended by the contracting parties."); *Mowbray v. Moselely, Hallgarten, Estabrook & Weeden, Inc.*, 795 F.2d 1111, 1117 (1st Cir. 1986) ("The crux in third-party beneficiary analysis . . . is the intent of the parties").

Because Plaintiffs have not established that the City and their respective landlords intended through their contract to confer an enforceable benefit upon Plaintiffs, Plaintiffs' procedural due process challenge to Vermont's Disconnect Statute and the City's Ordinance and practices and polices based upon a *contractual* entitlement to water service must fail.

### ii.   Statutory Property Interest in Water Service.

Plaintiffs assert a statutory basis for their property interest in water service while the City contends no such interest exists. Although the parties cite numerous cases from other jurisdictions on the issue of whether, when, and how a statutory protected property interest may be found in water service, here any such interest must be found in Vermont law. *See Sealed*, 332 F.3d at 56 ("[W]here the claimed interest is rooted in state law, we look to the particular state statute . . . or regulation that purports to establish the asserted entitlement in order to assess the parameters and the strength of the alleged interest to determine if due process protection applies.") (internal quotation marks omitted). Accordingly, while a brief survey of the conflicting caselaw from other jurisdictions is instructive, it is not controlling.

In *Craft*, the United States Supreme Court found a protected property interest under Tennessee law in a public utility's provision of electricity. The Court noted that service could only be terminated for nonpayment of a valid bill for service and Tennessee law sets forth remedies for wrongful termination. *Craft*, 436 U.S. at 11-12 ("Because petitioners may terminate service only 'for cause,' respondents assert a 'legitimate claim of entitlement' within the protection of the Due Process Clause.") (internal citations and footnote omitted). Other courts have adopted a similar approach.[6]

---

[6] The Second Circuit has not squarely addressed the issue although it has questioned whether water service could properly be characterized as a fundamental right. *See Walz v. Town of Smithtown*, 46 F.3d 162, 167 (2d Cir. 1995) ("The district court held that there is a fundamental right to water supply protected by the Due Process Clause. This is a novel ruling. We may take judicial notice of the fact that a multitude of local governments do not supply water to their residents, and there is no authority suggesting that these governmental units are in violation of the Constitution.").

In *Pilchen v. City of Auburn*, 728 F. Supp. 2d 192 (N.D.N.Y. 2010), the district court found that tenants had a protected property interest in water service based upon a municipal ordinance which provided that "[t]his chapter is therefore enacted in order that the water supply system shall be properly maintained, improved and extended primarily for the benefit of the water users and taxpayers within the City limits." *Id.* at 199. The *Pilchen* court concluded that "[t]he ordinance is clear in specifying the City's intent and purpose to supply water service to residences in the City (and its immediate vicinity) for the benefit of both water users and taxpayers." *Id.*

The district court reached the same conclusion in *Davis v. Weir*, 328 F. Supp. 317 (N.D. Ga. 1971), opining that "[t]here can be no serious doubt that water is an absolute necessity of life[,]" so that when a municipality undertakes to provide water to all applicants subject only to reasonable rules and regulations, the municipality has offered an "entitlement" the termination of which must be accompanied by procedural due process for the actual user. *Id.* at 322. In affirming this conclusion, the Fifth Circuit noted that, on appeal, the municipality had abandoned its position to the contrary. *See Davis v. Weir*, 497 F.2d 139, 143 (5th Cir. 1974).[7]

Some courts have gone further and have found a protected interest in continued water service based primarily on a state's landlord-tenant code essentially concluding that notice to a tenant of discontinued water service is necessary to allow the tenant to preserve his or her interest in the leasehold. *See, e.g., DiMassimo v. City of Clearwater*, 805 F.2d 1536, 1539-40 (11th Cir. 1986); *Turpen v. City of Corvallis*, 26 F.3d 978, 979 (9th Cir. 1994).

The City attempts to distinguish *Craft* and its progeny by asserting that Vermont law allows a municipality to refuse continued service on the basis of nonpayment and "imposes no limitations on municipal discretion in choosing among statutory collection

---

[7] In *West v. Village of Morrisville*, 563 F. Supp. 1101, 1102-03 (D. Vt. 1983), this court cited *Weir* and similar cases which have found a protected property interest in water service and stated it had "no quarrel" with their reasoning or outcome, but concluded the facts before it were distinguishable. The Second Circuit reversed *West* on abstention grounds without reaching the issue. *See West v. Village of Morrisville*, 728 F.2d 130 (2d Cir. 1984).

remedies[.]" (Doc. 110-1 at 15). It thus seeks to cast water service as a discretionary benefit which the City may withhold or extend subject to the terms and conditions it sees fit to impose. This argument misses the mark. No court, including the United States Supreme Court in *Craft*, has recognized a protected property interest in *free* utility service. *See Craft*, 436 U.S. at 11 ("[P]ublic utilities in Tennessee are obligated to provide service to all of the inhabitants of the city . . . and may not terminate service except for nonpayment of a just service bill.). Correspondingly, no court has concluded that a municipality may not impose reasonable connection requirements or exercise its discretion in choosing among available collection methods. Rather what these courts have focused on is whether a municipality may terminate service "at will" and whether any procedures and rights must accompany a termination even when it appears to be authorized. As the *Craft* Court noted, when "[a]n aggrieved customer may be able to enjoin a wrongful threat to terminate, or to bring a subsequent action for damages or a refund[,] [t]he availability of such local-law remedies is evidence of the State's recognition of a protected interest." *Id.*

Like the Tennessee statutory scheme in *Craft*, Vermont restricts water service termination to nonpayment of a just bill. In the event of nonpayment of a just bill, Vermont law does not allow termination if such nonpayment is related to a nonrecurring charge, is less than fifteen dollars, is subject to an appeal, or if the ratepayer has not been afforded the opportunity to enter into a repayment plan. When a proposed termination for nonpayment clears these hurdles, Vermont law creates an exception when there is serious medical need for water service and, in all cases, regulates the manner and content of notice, the timing of termination, and the right to reinstatement, hearing, and appeal. Where state law "mandates that utilities may not terminate utility service at will but only under certain enumerated conditions and after giving proper notice" there is "an independent source of state-authorized law that gives rise to a legitimate claim of entitlement to [a service] from a municipal utility." *Gunter v. Long Island Power Auth.*, 2011 WL 1225791, at *8 (E.D.N.Y. Feb. 15, 2011) (citing *Pilchen* for the proposition that "tenants have a due process property interest in water service").

In support of its claim that no protected interest should be found, the City cites a number of cases which are readily distinguishable. In *Golden*, the Sixth Circuit concluded that no protected property interest in water service could be found based upon a complete failure of proof. *See Golden*, 404 F.3d at 957, 958 (observing that plaintiff cited "no Ohio statutes or case law in support of her . . . entitlement to water service" but instead "rest[ed] her case on the bare assertion that because water is 'an absolute necessity of life,' the City's termination of her service was unconstitutional.").

In *Ransom v. Marrazzo*, 848 F.2d 398 (3d Cir. 1988), the Third Circuit examined a procedural due process claim arising out of the denial of water service based upon an unpublished standard that required a new occupant to pay the prior occupant's outstanding bill as a condition precedent to the establishment of water service. The court noted that "[i]t is well-settled that the expectation of utility service rises to the level articulated in [*Roth* and *Sindermann*] of a 'legitimate claim of entitlement' encompassed in the category of property interests protected by the Due Process Clause[,]" *id* at 409, but found the claim moot based upon the city's promulgation of new regulations.

Other courts have concluded that there is no protected interest in water service where the statutory scheme in question does not provide for water service to all inhabitants that request it. *See, e.g., Midkiff*, 409 F.3d at 764-67 (holding there is no protected property interest in water service from a political subdivision that does not act as a public utility, which is not required "to provide service to any particular individual or group," and which offers water service only to "a person holding property"); *Sterling*, 579 F.2d at 1354 & n.12 (finding no protected property interest in water service where landlord requested termination of service, where Village's ordinance "does not purport to provide service to all people," and where "[t]he issue of what rights a tenant has when the municipality terminates water because the landlord has failed to pay the water bill is not before us.").

At least one court has refused to find a protected property interest in water service where the authority to regulate water service has been conferred exclusively upon the municipality. *See Stevo v. Frasor*, 2011 WL 253963, at *1, 5 (N.D. Ill. Jan. 3, 2011)

(finding no protected interest in water service because Illinois delegates to municipalities the right to own and operate water utilities, including the right to regulate water distribution, and thus municipality properly terminated water service to resident who had been "given fair warning over many months that the water would be turned off if he did not install an outdoor meter as required of all water customers under a City ordinance.").

Still other courts, in rejecting a non-property owner's claim to entitlement to continued water service, have emphasized the absence of statutory entitlement to *free* water service--a claim not made here. *See Coghlan v. Starkey*, 845 F.2d 566, 569-70 (5th Cir. 1988) (finding no right by tenant to free water service because enabling legislation did not limit termination "for cause," and because tenant "adamant[ly] refuse[d] even to apply for service," and thus it was "not unreasonable for a water district to refuse to supply water to persons who fail or refuse to pay for water consumed by them as renters" and noting that not even "the charter that created the District [contained] a suggestion that water service was a right of the citizens[.]"); *Marrero-Garcia v. Irizarry*, 33 F.3d 117, 123 (1st Cir. 1994) (finding no entitlement to water service by "consumers" where residents "refused to register an account, place a bond or pay for water services"); *James v. City of St. Petersburg*, 33 F.3d 1304, 1307 (11th Cir. 1994) (refusing to find a protected property interest in free water service based upon Florida's landlord tenant code and noting that "[b]ecause neither James nor her landlord complied with the City's requirements for initiating water service, which included the making of a security deposit, James had no legitimate claim of entitlement to water service under Florida law.").

The foregoing jurisprudence reflects a consensus that in order to establish a protected statutory interest in water service, a tenant must establish a statutory intent to provide water service to all users regardless of their status as property owners or tenants which is, in turn, protected by procedural mechanisms intended to prevent an erroneous deprivation of that interest for reasons other than unexcused nonpayment. Plaintiffs assert their claimed statutory property interest easily satisfies this standard.

Plaintiffs begin by arguing that both Vermont's landlord-tenant statutes and the City's Minimum Housing Standards reflect a clear intent that water service be provided

as a condition precedent to occupation of a rental dwelling unit and provide for statutory remedies against a landlord in the event that service is not provided.  Plaintiffs urge the court to find a protected real property interest on this basis and in the courts' recognition that "due process concerns may be triggered by something less than 'a complete, physical, or permanent deprivation of real property.'"  *Diaz v. Paterson*, 547 F.3d 88, 95 (2d Cir. 2008) (quoting *Connecticut v. Doehr*, 501 U.S. 1, 12 (1991)).  As noted, only a handful of jurisdictions have found a tenant's protected property interest in water service on this basis.  Without reaching the issue, the court turns to a statutory source for which Plaintiffs have a far firmer footing.

As Plaintiffs point out, the City's Charter authorizes and empowers the City "to provide a suitable supply of water for the city and the inhabitants that live along or near its line of pipes in other municipalities, against fire and for sanitary, domestic, and general industrial uses, beneficial to the public[.]" 24 V.S.A. App. § 1-507.  This tracks Vermont's enabling legislation which authorizes and empowers municipalities to take water "and distribute the same through such municipal corporation for the purpose of supplying the inhabitants thereof with water for fire, domestic, and other purposes." 24 V.S.A. § 3301.  Neither the statute nor the Charter draws a distinction between property owners and tenants but instead both purport to extend water services to all "inhabitants." This distinction is important as it reflects an intent to provide water service on a nondiscriminatory basis subject only to reasonable rules and regulations.  *See Pilchen*, 728 F. Supp. 2d at 199 (ordinance which states that it was "enacted in order that the water supply system shall be properly maintained, improved and extended primarily for the benefit of the water users and taxpayers within the City limits" is "clear in specifying the City's intent and purpose to supply water service to residences in the City (and its immediate vicinity) for the benefit of both water users and taxpayers.").

The City nonetheless contends that regardless of any property interest Vermont law creates in water service for *property owners*, it cannot be said to create these same interests for *mere tenants*.  According to the City, Vermont's Disconnect Statute "uses the term 'ratepayer' to describe the customer.  Though the statute does not define this

term, it clearly refers to the owner of the property provided with water service." Doc. 110-1 at 15.  However, the State, itself, argues that Vermont's Disconnect Statute contains no such distinction.  It does not restrict the rights and remedies afforded to "ratepayers" to property owners alone but extends those rights and remedies to any person, including a tenant, who pays for municipal water service.  *See* Doc. 117 at 4 ("There is nothing in the statute that defines a *ratepayer* or that prevents a tenant from being a ratepayer."), at 5-6 ("The statute does not define *ratepayer* to include or exclude tenants from the notice and hearing provisions."), at 8 ("[T]he statute neither excludes tenants as ratepayers nor prevents tenants from requesting hearings to challenge disconnection of service.").

Moreover, Vermont law provides even mere water *users* with certain statutory rights, protections, and obligations.  Vermont's Disconnect Statute requires both a "ratepayer" and any occupant to receive a detailed written notice prior to the lawful termination of water service.  24 V.S.A. §§ 5142-5143.  It provides for further written notice to an occupant once the disconnect has occurred.  24 V.S.A. § 5145.  The State contends that "[b]y providing simultaneous, pre-deprivation notice to ratepayers and occupants, the statute sufficiently anticipates the needs of interested parties to contest the termination proceedings and gives them ample time . . . to take steps to protect their interests." Doc. 117 at 6.  The City's Ordinance also requires pre-deprivation notice to mere water users.  *See* Ordinance, § 19-36(b) (prior to water service shut off, the "user of water on the premises in question" must be given "not less than three (3) days['] notice.").

If a mere user of water service has no interest to be protected, mandatory notices of termination would be meaningless, unnecessary, and would assume the dubious status of a statutory and municipal courtesy.  A more reasonable conclusion is that Vermont law affords notice to a mere user of water service because Vermont recognizes an interest that warrants protection.  *See Roth*, 408 U.S. at 577.  It also imposes a corresponding obligation on that actual user to pay for the water received.  24 V.S.A. § 3306 ("The

owner or occupant of any tenement, house, or building, who takes the water of such municipal corporation shall be liable for the rent or price of the same[.]").

Plaintiffs further point out that Vermont caselaw in the context of public utility service also supports a conclusion that a protected property interest may be found in water service. They contend that the City is simply incorrect in asserting that "[i]n Vermont, utilities have no obligation to provide service to anyone and everyone who asks for it." Doc. 110-1 at 14 (citing *Hawkins v. Vermont Hydro-Electric Corp.*, 126 A. 517, 518 (Vt. 1924)). The court agrees.

In *Hawkins*, while noting a utility may impose certain connection requirements such as ground wires and a switch box, the Vermont Supreme Court observed "[t]hat the supplying companies are under a general obligation to supply all householders living within the district which the company has professed to service is therefore plain." *Hawkins*, 126 A. at 518.

Other Vermont cases have recognized a protected property interest in power services. In *Ratepayers Coalition of Rochester v. Rochester Elec. Light and Power Co.*, 571 A.2d 606 (Vt. 1989), the Vermont Supreme Court observed that "[w]here individual electric service is to be terminated by a utility, due process rights are involved and due process standards of notice and an opportunity for a hearing must be observed because entitlement to electric service is a protectable property right." *Id.* at 609. The federal court reached this same conclusion in *Condosta v. Vermont Elec. Co-op., Inc.*, 400 F. Supp. 358 (D. Vt. 1975), concluding that "electrical service does constitute 'property' within the meaning of the Fourteenth Amendment." *Id.* at 364. In doing so, the court noted that Vermont law required public utilities to "sell and distribute the same to any and all persons . . . that desire to use the same within this state," and observed that "the plaintiff relies upon electric service in his daily life" and "[p]robably no other single utility service is so vital to this plaintiff's day-to-day existence" as electricity. *Id.* [8]

---

[8] Courts have made same observations with regard to water service. *See Weir*, 328 F. Supp. at 321 (describing City of Atlanta's scheme for providing water service and observing "[t]here can be no serious doubt that water is an absolute necessity of life."); *see also Craft*, 436 U.S. at 18

With regard to the right to water service from a public corporation, the Vermont Supreme Court has held that "[t]he duty to furnish water, demandable as of right, as an obligation of a water company, subject to such reasonable requirements as those related to payment and plumbing connections, cannot be seriously disputed." *Corcoran v. Village of Bennington*, 266 A.2d 457, 464 (Vt. 1970). It has also held that in the absence of a statute restricting such rights, the occupant of a premises dependent upon a public service corporation for a supply of water, if otherwise entitled to service, cannot be denied service merely because he or she is a tenant and not a property owner. *See Waldron v. Int'l Water Co.*, 112 A. 219, 221 (Vt. 1921). Water service providers must therefore fulfill their duties to supply water to all inhabitants with "no unjust discrimination." *Hall v. Swanton*, 35 A.2d 381, 384 (Vt. 1944). "Although conditions may attach to the furnishing of service, they may not be used as excuses to avoid the recognition of a right." *Corcoran*, 266 A.2d at 464.[9] These cases strongly support a conclusion that the Vermont courts would also recognize a tenant's protected property interest in municipal water service where is it offered to all "inhabitants."

In summary, while it is not enough to label a utility service as "essential" to daily life in order to find that it is a protected property interest under Vermont law, here an essential utility service is provided pursuant to a City Charter that offers it to all "inhabitants" including tenants pursuant to an enabling statute that also extends it to all "inhabitants." Under Vermont law, this service cannot be terminated "at will" but is subject to certain enumerated conditions and must be accompanied by certain pre and

---

(examining Tennessee's statutory scheme and noting that "[u]tility service is a necessity of modern life; indeed, the discontinuance of water or heating for even short periods of time may threaten health and safety.").

[9] The City argues strenuously that it may impose conditions precedent to water service such as a requirement that the City deal only with property owners. If water service is a protected property interest under Vermont law, the City cites no authority for the proposition that it may negate that interest through a connection requirement. Quite the contrary, Vermont law authorizes a municipality to extend greater protections to the rights of "consumers" of water service, 24 V.S.A. § 5148, but does not authorize them to extend less. Accordingly, while the City may impose conditions precedent to water service for all water users, a refusal to deal with an entire class of inhabitants cannot be justified as a reasonable connection requirement.

post-deprivation notice and procedures intended to protect the interest in water service of the "ratepayer" as well as the non-ratepaying occupant. Plaintiffs have thus established a statutorily protected property interest in water service subject to payment and reasonable connection requirements. The court therefore examines whether Vermont's Disconnect Statute and the City's Ordinance provide procedural due process to protect that interest.

### 2. What Process Is Due.

The minimum procedural protections required by the Due Process Clause of the U.S. Constitution are determined by federal law. *See Ciambriello v. Cty. of Nassau*, 292 F.3d 307, 319 (2d Cir. 2002) ("The Constitution, not state law sources . . . , determines what process is due."). Procedural due process generally requires notice and an opportunity to defend the protected interest. *See Goldberg*, 397 U.S. at 267-68 (principles of due process "require that a [welfare] recipient have timely and adequate notice detailing the reasons for a proposed termination, and an effective opportunity to defend[.]"). Although Vermont's Disconnect Statute and the City's Ordinance overlap and intertwine, they are not so interdependent that a conclusion that one is constitutionally sufficient automatically cures any deficiencies in the other. This is especially true in light Plaintiffs' claim that the City's Ordinance does not follow the Disconnect Statute. The court thus examines each independently.

### i. Whether the Disconnect Statute Affords Procedural Due Process.

Vermont's Disconnect Statute requires notice of a potential termination of water service to be given to both the ratepayer and the occupant of the dwelling. 24 V.S.A. § 5143(a). The form of the notice is written in plain language, on conspicuous paper and in legible font, and clearly advises the recipient of the reason for the termination, when it will occur, how much it will cost to restore service, exceptions to termination, where additional information may be obtained, and how and where an appeal may be taken. *See* 24 V.S.A. § 5144. The Disconnect Statute further requires this notice to be given within forty days after delinquency and no more than twenty and no less than fourteen days prior to disconnection of service. 24 V.S.A. §§ 5143-5145. Only the undefined "ratepayer"

may appeal the termination of water service. *See* 24 V.S.A. § 5147. The statute requires that appeals be heard "promptly and fairly" "after notice to all interested parties" and suspends disconnection during the pendency of the appeal. 24 V.S.A. § 5147.

Plaintiffs' procedural due process challenge to Vermont's Disconnect Statute is two-fold. First, they contend that providing a "notice addressed to someone other than the tenant-occupant is insufficient." (Doc. 123 at 4.) Second, they argue that providing a hearing and rights of appeal to only the "ratepayer" is constitutionally invalid. The remainder of Plaintiffs' procedural due process challenges pertain to how the City has interpreted and implemented the Disconnect Statute.

*Mathews v. Eldridge*, 424 U.S. 319 (1976) provides the seminal framework for determining whether the procedure afforded by Vermont's Disconnect Statute is constitutionally sufficient. It requires the court to examine:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* at 335.

Here, it is beyond dispute that the magnitude of Plaintiffs' private interest in continued water service is substantial in light of water's status as a necessity of daily living that is essential to health, well-being, safety, and sanitation. The risk of erroneous deprivation under Vermont's Disconnect Statute, however, is not great for several reasons.

First, Vermont law requires a detailed and comprehensive written notice to be provided to a water user as a condition precedent to termination. This notice provides information about the reason for the termination, the potential timing of the termination, how termination may be avoided, and how and where the user may acquire additional information. The notice further advises of a statutory exception to termination in the

event that a resident within the ratepayer's household has a medical condition that renders continued water service indispensable.[10]

Second, the Disconnect Statute imposes certain timing requirements that adequately protect a water user's interests. With at least two weeks' notice, a tenant is afforded sufficient time to contact the authorities to determine whether water service termination may be prevented and sufficient time to negotiate with his or her landlord or seek injunctive relief against that person or entity or against the municipal water service provider. A tenant is also provided with notice if a ratepayer appeals and when and where that appeal will be heard. *See* 24 V.S.A. § 5147. Plaintiffs point to no additional information that the Disconnect Statute fails to provide which would be necessary to protect their interests--the fact that the notice is addressed to the "customer" rather than the tenant does not deprive them of notice. *Cf. Weir*, 328 F. Supp. at 321-22 ("The crucial factor in the instant case is that the effect of the collection procedure is to terminate an important benefit provided by a governmental agency (albeit at a cost to the customer) without notice to the person who is the actual recipient of that benefit and who is the person who will suffer a serious loss without that benefit . . . This result is unacceptable under . . . the due process clause of the Fourteenth Amendment.").

Courts have held that provided an aggrieved party has the time and opportunity to pursue his or her claim in an available forum, due process is satisfied. *See New York State National Organization for Women v. Pataki*, 261 F.3d 156, 165 (2d Cir. 2001) (If the state "were to have flatly precluded a claimant from pursuing his or her discrimination claim in all available procedural forums and thereby extinguished the claim, a deprivation would have occurred.); *Pappas v. City of Lebanon*, 331 F. Supp. 2d 311, 321 (M.D. Pa. 2004) ("Deprivation of a cause of action occurs when adjudicatory procedures for vindication of the claim are foreclosed. . . . So long as adjudicatory

---

[10] In issuing injunctive relief based upon Plaintiff Brenda Brown's medical condition, the state court apparently had little difficulty in concluding that Ms. Brown was entitled to rely on the medical condition exception without analyzing whether she could accurately be described as a resident within her landlord's household.

procedures remain available, the individual has not suffered a deprivation of the cause of action."); *DiMassimo*, 805 F.2d at 1540 (ruling that "pretermination notice to the tenant is necessary to prevent the City from destroying rights granted to [plaintiff] by state law.").

Turning to the probable value of additional or substitute procedures, the Vermont's Disconnect Statute provides for an appeal by the "ratepayer" to the local legislative body or selectboard, 24 V.S.A. § 5147, and requires the municipality to offer the "ratepayer" a repayment plan. 24 V.S.A. § 5143(b). Assuming a tenant is not a "ratepayer," no appellate rights other than notice of the appeal are provided. Somewhat tellingly, Plaintiffs do not adequately explain what benefits they would reap in the event such an appeal were provided. A tenant is already aware that termination of water service is imminent and is aware of the medical exception pursuant to which water service may be restored. A hearing to remind the tenant of these facts would serve little purpose. Moreover, a tenant's recourse is primarily against his or her delinquent landlord and Vermont law sets forth a statutory scheme for pursuing those rights and remedies in Vermont's courts. *See* 9 V.S.A. §§ 4457-58.[11] A local legislative body or selectboard is generally not empowered to resolve those disputes. *See DiMassimo*, 805 F.2d at 1540 (observing that "[a] city may undoubtedly grant an employee of its utility the power to correct bills but a city employee would have no jurisdiction to resolve disputes between landlords and tenants which caused the terminations of service in this case." *Id.*; *see also Davis*, 328 F. Supp. at 322 ("The Court does not believe the same type of factual issues [are] involved here" as in *Goldberg*, where a hearing was found necessary, and "[t]he Court does not see what function, under the due process clause, a hearing on the tenant's liability would serve").

---

[11] Vermont law requires a landlord to "provide an adequate amount of water to each dwelling unit properly connected to hot and cold water lines." 9 V.S.A. § 4457(c). If the landlord fails to satisfy this mandatory requirement, Vermont law provides the following remedies to the tenant: "(1) withhold the payment of rent for the period of noncompliance; (2) obtain injunctive relief; (3) recover damages, costs, and reasonable attorney's fees; and (4) terminate the rental agreement on reasonable notice." 9 V.S.A. § 4458.

In determining whether the Vermont Disconnect Statute must provide tenants a post-deprivation hearing or appeal, the governmental interest, including the burden imposed, must also be considered. "The most visible burden would be the increased cost resulting from the increased number of hearings and the expense of providing benefits to ineligible recipients pending decision." *Mathews*, 424 U.S. at 347. The State's interest is in providing a collection method for municipal water service that adequately protects the rights of ratepayers and water users. Vermont's Disconnect Statute furthers these interests at virtually no cost to the State and at only an appropriate cost to the municipal body which actually provides the service for which it has not been paid. *See Craft*, 436 U.S. at 16 ("[D]ue process requires the provision of an opportunity for the presentation to a designated [municipal] employee of a customer's complaint that he is being overcharged or charged for services not rendered."). Procedural due process does not require the State to create an ideal forum for protecting a water user's interests. *See Ownbey v. Morgan*, 256 U.S. 94, 110-11 (1921) ("The due process clause does not impose upon the states a duty to establish ideal systems for the administration of justice, with every modern improvement and with the provision against every possible hardship that may befall.").

On balance, under *Mathews v. Eldridge*, Vermont's Disconnect Statute provides procedural due process to sufficient protect a water user's interest in continued water service even when that water user is not a "ratepayer." The court therefore DENIES Plaintiffs' cross-motion for summary judgment on the issue of whether Vermont's Disconnect Statute affords procedural due process and hereby DISMISSES that claim.

### ii. Whether the City's Ordinance, Practices and Policies Afford Procedural Due Process.

The City relies heavily on Vermont's Disconnect Statute in claiming it affords *property owners* procedural due process in water service terminations.[12] There is,

---

[12] The City does not claim that it affords procedural due process to tenants as mere water users and maintains its position that no such process is due based upon the alleged absence of a protected property interest.

however, scant evidence that the City actually follows the Statute. In an affidavit the City supplied in moving for summary judgment, the City avers that "[p]ursuant to City policy, whenever a water-service account is in arrears for two quarters, a notice-of-delinquency form letter is mailed to the ratepayer." Doc. 110-7 at 1. Although the City has provided examples of all other notices, an exemplar of this notice-of-delinquency letter has not been provided, and thus there is no evidence that it conforms to the statutory form of notice required by the Disconnect Statute.

In any event, the City concedes that the notice-of-delinquency is not sent to the occupant as required by Vermont's Disconnect Statute and seeks to excuse this violation by erroneously interpreting the Disconnect Statute to equate the term "ratepayer" with property owner. This interpretation is not supported by the plain language of the statute and has been rejected by the State, itself, in this lawsuit. The further problem with this argument is that the Vermont Disconnect Statute *requires* the statutory form of notice to be provided to the "occupant" even when the occupant is not the "ratepayer." *See* 24 V.S.A. § 5143(a) ("A copy of the notice shall be sent to the occupant of a residential dwelling which will be affected by the disconnection if the occupant is different than the ratepayer."). The City concedes this is not done. To the extent the City relies on its own form of notice for water service termination, there can be no serious doubt that it fails to conform to the statutory form of notice, the time period of notice, or the manner of providing notice required by Vermont's Disconnect Statute.

As the City correctly points out, and as Plaintiffs concede,[13] these apparent violations of Vermont law do not provide the basis for a § 1983 claim. *See Maine v. Thiboutot*, 448 U.S. 1, 1 (1980) (holding "the § 1983 remedy broadly encompasses violations of federal statutory as well as constitutional law."); *Pollnow v. Glennon*, 757 F.2d 496, 501 (2d Cir. 1985) (ruling "it is unnecessary for us to determine whether

---

[13] Plaintiffs describe their claim as follows: "Contrary to Defendant's claim . . . Plaintiffs do not allege that failure to follow a municipal ordinance or state statute is a violation of 42 U.S.C. § 1983. It is the violation of due process that generates the Section 1983 cause of action. And it is the lack of ascertainable standards due to Defendant's failure to comply with the [O]rdinance and statute that constitutes a violation of due process." (Doc. 119 at 6.)

appellees violated any applicable state law.  Clearly, a violation of state law is not cognizable under § 1983").  At the same time, the City cannot rely on Vermont's Disconnect Statute for procedural due process when it does not follow many of its mandatory requirements.  The court thus examines the City's Ordinance and the City's actual practices and policies, independent of Vermont's Disconnect Statute, to determine whether they afford Plaintiffs with procedural due process.

The City's Ordinance provides that the "user of water on the premises in question" must be given three days' notice prior to a water service termination.  Ordinance, § 19-36(b).  The Ordinance does not specify that the three days must be business days and thus notice may be giving on a Friday with the tenant losing two out of three days to seek protection of his or her rights over the intervening weekend.  This effectively guarantees the tenant not more than one day to contact the authorities, negotiate with his or her landlord, or seek injunctive relief.

In addition, neither the Ordinance nor the City's form of notice address appellate rights or provide notice of the statutory exceptions to water service termination.  There is also no requirement that the person terminating service provide immediate notice of that termination to the actual user.  Notice regarding the time of termination and the method of submitting payment is posted on the property itself.  If the City decides to hand-deliver notice to a tenant, it appears to do so only as a courtesy.

Application of the *Mathews v. Eldridge* factors to these facts and circumstances produces an unmistakable conclusion that the City provides neither reasonable notice nor a reasonable opportunity to defend to the tenants who are the actual users of municipal water service.  Plaintiffs' private interest in water service is substantial and the risk of an erroneous deprivation of that interest is great.  Procedural due process requires at least sufficient notice to ensure that access to available forums is not effectively foreclosed and a potential means of redress is not lost.  *See [NOW] v. Pataki*, 261 F.3d at 165.  Here, those avenues of relief are not reasonably available.  Accordingly, the form of notice, the manner of notice, and the time period for notice are constitutionally deficient.  *See Craft*, 436 U.S. at 14-15 ("Notice . . . does not comport with constitutional requirements when it

does not advise the customer of the availability of a procedure for protesting a proposed termination of utility service as unjustified[.]'").

Regarding the probable value of additional procedures, although a hearing or an appeal remains of limited value to tenants, this is primarily because the City refuses to adopt a mechanism whereby water service may be restored to a tenant who agrees to pay for his or her own use. "An essential principle of due process is that deprivation of life, liberty, or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'" *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950)). "[S]ome kind of hearing," *Loudermill*, 470 U.S. at 542, is thus required. At present, the City's Ordinance, policies, and practices do not appear to provide notice of a right to a hearing of any kind to anyone.

As for the governmental interest and the burden of additional procedures, the City contends that its interest is in collecting debts owed for water service provided. An adequate form of notice, a longer notice period, and appellate rights to the ratepayer do not materially interfere with this interest. At a minimum, the City must therefore comply with Vermont's Disconnect Statute in order to satisfy the requirements of procedural due process. The Vermont Legislature has already determined that the burdens associated with such compliance are appropriately imposed upon a municipality even where the stated purpose of the statute is to provide "a delinquency collection procedure." 24 V.S.A. § 5141. Courts that have gone further and actually required a municipality to offer water service to a tenant in his or her own name have generally done so as a matter of substantive due process or equal protection. Plaintiffs cite no authority, and the court has found none, where this right must be afforded as part of the procedural due process which must be afforded to an actual water user. Accordingly, while the court agrees with Plaintiffs that the City could provide this service without compromising its legitimate governmental interests, procedural due process does not require it to do so.

Because the City's Ordinance, policies and practices do not afford constitutionally sufficient notice and an opportunity to be heard, they do not afford the City's tenants with

procedural due process.  The court therefore DENIES the City's motion for summary judgment with regard to Plaintiffs' procedural due process claim (Count One), and GRANTS Plaintiffs' cross-motion for summary judgment with regard to this same claim.

### D.    Plaintiffs' Claim for Violation of Substantive Due Process.

Plaintiffs allege that the City has violated their substantive due process rights by preventing reinstatement of water service unless they pay their respective landlords' debts.  The City denies that it has any official policy or practice that requires tenants to pay their landlords' debts, and argues that it has a legitimate governmental interest in ensuring payment for water service which is furthered by a rational practice of requiring payment of arrearages incurred at a property before water service to that property is reinstated.

To prevail on their substantive due process claim, Plaintiffs must establish a valid property interest in water service, which the court has found, and must further establish that the City deprived them of that interest in an arbitrary and irrational manner.  *See Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 785 (2d. 2007) ("But having a cognizable property right is not enough.  In order to prevail on their substantive due process claim, plaintiffs must also show that defendants infringed their property right in an arbitrary or irrational manner.").  "[S]uch a claim is not established simply by proving that someone did not obtain what he or she is entitled to under state law." *Natale v. Town of Ridgefield*, 170 F.3d 258, 262-63 (2d Cir. 1999).  Instead, "[s]ubstantive due process standards are violated only by conduct that is so outrageously arbitrary as to constitute a gross abuse of governmental authority." *Id.* at 263.

Plaintiffs do not assert a fundamental right to water service and thus the parties agree that the City's Ordinance is subject to only rational basis review.  "Legislative acts that do not interfere with fundamental rights . . . carry with them a strong presumption of constitutionality and must be upheld if 'rationally related to a legitimate state interest.'" *Beatie v. City of New York*, 123 F.3d 707, 711 (2d Cir. 1997) (quoting *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 440 (1985)).  In this case, the Ordinance does

not require payment of a landlord's outstanding arrearages by a tenant as a condition precedent to water service restoration. The closest the Ordinance comes to such a requirement is to state that the City may "cause the water to be shut off, and to remain off, from the premises of the said user of the city water, until he shall have fully complied with all of the requirements of this chapter and the regulations of the department" and paid to the City "the sum of two dollars ($2.00) for cutting off and turning on the water." Ordinance § 19-36(a). The Ordinance, itself, thus does not impose the requirement Plaintiffs identify as the basis for their substantive due process challenge.

As for the City's policies and practices, Plaintiffs must establish that they rise to the level of an "official policy or custom that . . . causes the plaintiff to be subjected to . . . a denial of a constitutional right." *Zahra v. Town of Southold*, 48 F.3d 674, 685 (2d Cir. 1995) (quoting *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983)). "'The mere assertion, however, that a municipality has such a custom or policy is insufficient in the absence of allegations of fact tending to support, at least circumstantially, such an inference." *Dwares v. City of New York*, 985 F.2d 94, 100 (2d Cir. 1993).

Here, it would be inaccurate to characterize the City's official policy or custom as one requiring tenants to pay for their landlords' debts. Neither plaintiff was actually required to do this in order to obtain a preservation or restoration of water service, and stray statements by the City's Clerk and Treasurer that this option was available do not constitute an official policy or custom. Rather, the evidence supports the more limited conclusion that the City has an official policy or custom, reflected in its Ordinance, that outstanding arrearages for water service to a property must be paid before water service to that property is restored. As the City repeatedly explains, it will accept payment from anyone--the property owner, a bank whose mortgage is secured by the property, a purchaser of the property, or a tenant--without any requirement that the payor have either an interest in the property or any responsibility for the arrearages in question. In this respect, the City properly treats the arrearages as a lien on the property which must be satisfied before water service is restored.

As the City further explains, in this case, at least some of the arrearages were attributable to Plaintiffs' own water usage, for which both the Ordinance and Vermont law makes them independently responsible, regardless of any arrangement they may have made with their respective landlords. *See* Ordinance §§ 19-30; 19-36(a); *see also* 24 V.S.A. § 3306. This distinguishes the instant case from those in which a substantive due process violation has been found because, as a condition to water service, an innocent third party has been required to pay his or her existing or prospective landlord's debt or that of a prior tenant for which they would not otherwise be liable. *See, e.g.*, Davis, 497 F.2d at 142 (observing that "applicants whose contemplated service address is encumbered with a pre-existing debt (for which they are not liable)" cannot be forced to pay that debt in order to obtain water service); *Pilchen*, 728 F. Supp. 2d at 202 (municipality coerced "innocent third party" into "assuming her landlord's debt in order to maintain a service the City has agreed to provide."); *Koger v. Guarani*, 412 F. Supp. 1375, 1391 (E.D. Pa. 1976) ("The City has no valid governmental interest in securing revenue from innocent applicants who are forced to honor the obligations of another[.]"). Courts have not found a substantive due process violation where innocent third party status cannot be claimed.[14]

At best, Plaintiffs demonstrate that they *could have* restored water service had they been willing to pay their respective landlords' debts and that a more fair and

---

[14] *See, e.g., Dunbar v. City of New York*, 251 U.S. 516, 518 (1920) (holding no substantive due process violation occurs when landlord is charged with tenants' water bill as a lien on the landlord's property even when tenants agreed in their lease to pay such charges); *Mansfield Apartment Owners Ass'n v. City of Mansfield*, 988 F.2d 1469, 1477 (6th Cir. 1993) ("[W]e reject the claim that conditioning the receipt of water . . . service on the satisfaction of past due charges for services rendered to the applicant's residence raises the question of a substantive due process violation."); *Ransom*, 848 F.2d at 411 (rejecting "a substantive due process challenge, seeking nothing less than a ruling that the practice and policy of conditioning water and sewer service on the satisfaction of pre-existing charges result in an unconstitutional deprivation of property regardless of the procedural safeguards installed."); *Chatham v. Jackson*, 613 F.2d 73, 76 (5th Cir. 1980) (distinguishing *Weir* because it involved nondelinquent tenants and affirming "the basic ruling of our cases that the delinquent service charges are liens against the property which authorize the discontinuance of such services to the owner of the property [which] remains unchanged.").

reasonable practice would be to require Plaintiffs to pay only their proportionate share of the arrearages (with a right to recover from their landlords for their overpayment of rent) coupled with the right to establish water service in their own names going forward. This falls far short, however, of establishing that the City's practice of requiring repayment of arrearages incurred at a property before water service to that property is restored is an "irrational" or "arbitrary" method of collecting payment for water services which "constitute[s] a gross abuse of governmental authority." *Natale*, 170 F.3d at 263. In the absence of such evidence, the court has no authority to impose upon the City what might be a more fair and reasonable practice. *See New Orleans v. Dukes*, 427 U.S. 297, 303 (1976) (per curiam) (rational basis review does not authorize "the judiciary [to] sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines.").

For the foregoing reasons, the court hereby GRANTS Defendant's motion for summary judgment with regard to Plaintiffs' substantive due process claim (Count Two) and DENIES Plaintiffs' cross-motion for summary judgment with regard to this same claim.

### E.     Plaintiffs' Claim for Violation of Equal Protection.

Plaintiffs assert a violation of their right to equal protection under the Fourteenth Amendment based upon the City's refusal to contract directly with tenants for water service.[15] Plaintiffs contend that the City irrationally draws distinctions between two different classes of tenants. First, between tenants whose landlords are in default in payment of their water bills and tenants whose landlords are not in default. And second, between tenants who cannot obtain water service in their own names and property owners who can. Plaintiffs neither claim a fundamental right to water service, nor claim their identified classifications involve suspect classes. *See City of Cleburne*, 473 U.S. at 440 (listing examples of suspect classes such as race, alienage, national origin, and gender).

---

[15] As noted, the Ordinance states that "the water department in laying a new service, in furnishing water, doing work, or furnishing materials for such services shall deal only with [the] owner of the premises, or his duly authorized agent[.]" Ordinance, § 19-24.

The City contends that no equal protection violation may be found because in the absence of a statutory obligation to provide water service to any particular person or class of persons, the City may lawfully "chose to draw the line at property owners." Doc. 110-1 at 36. In doing so, the City argues that it may treat property owners who pay their water bills differently from property owners who do not. "To successfully assert an equal protection challenge, petitioners must first establish that the two classes at issue are similarly situated. '[T]he government can treat persons differently if they are not 'similarly situated.'" *Yuen Jin v. Mukasey*, 538 F.3d 143, 158 (2d Cir. 2008) (quoting *Jankowski-Burczyk v. I.N.S.*, 291 F.3d 172, 176 (2d Cir. 2002)).

### 1. Delinquent v. Non-Delinquent Landlords.

With regard to Plaintiffs' first classification, tenants whose landlords are delinquent in payment of their water bills, and tenants whose landlords are not, the two classes are not similarly situated. Rather, there is a rational and legitimate difference between a landlord who is paying for a municipal service that benefits the building that houses his or her tenants and one who is not. Vermont law recognizes this distinction by authorizing a lien against the property of the latter. *See* 24 V.S.A. § 3306 (in the event of nonpayment, "[t]he charges, rates or rents for water shall be a lien upon the real estate furnished with the municipal corporation water in the same manner and to the same effect as taxes are a lien on real estate."). It further allows that lien to be foreclosed thereby depriving a delinquent landlord of an interest in his or her property. *See* 32 V.S.A. § 5061(b).

Moreover, because the City does not condition the right to establish water service in a tenant's own name based upon the status of a landlord's payment history, this case is distinguishable from those in which a tenant nonetheless encounters "a refusal to reinstate water service because the landlord has failed to pay the water bill" which has been held to be "a violation of the tenant's right to equal protection." *Sterling*, 579 F.2d at 1355 (collecting cases); *see also O'Neal v. City of Seattle*, 66 F.3d 1064, 1068 (9th Cir. 1995) (finding equal protection violation where water service was refused based upon status of previous tenant's debt because "[r]efusing a new tenant water service because of the debt

of an unrelated prior tenant is illogical" ). Here, the City refuses to deal with any tenants regardless of whether their landlords are delinquent.

"[A] classification neither involving fundamental rights nor proceeding along suspect lines is accorded a strong presumption of validity." *Heller v. Doe*, 509 U.S. 312, 319 (1993). "Such a classification cannot run afoul of the Equal Protection Clause if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Id.* at 320. In this case, Plaintiffs' first challenged classification is not between similarly situated individuals and does not draw an irrational or arbitrary distinction between those individuals. Accordingly, no Equal Protection violation may be found.

### 2.   Property Owners vs. Tenants.

Plaintiffs' second classification identifies classes of persons that are arguably more similarly situated even though there are obvious differences between them. Both property owners and tenants are potential applicants for, and users of, water service from the City. Both constitute "inhabitants" for whom the City is authorized and empowered to provide water service under its Charter. The only distinction between the classes is that one owns the property benefitted by the water service, and the other only has a leasehold interest in it. Like ownership, a leasehold interest is a protected property interest under Vermont law. *See Alger v. Dep't of Labor & Indus.*, 2006 VT 115, ¶ 30, 181 Vt. 309, 325, 917 A.2d 508, 520.

Some courts have found the differences between property owners and tenants sufficient to preclude an equal protection claim. *See, e.g.*, *DiMassimo*, 805 F.2d at 1542 ("We therefore hold that the landowner and the tenants are so dissimilarly situated that they may be treated differently under the City's ordinances"); *Midkiff*, 409 F.3d at 771 ("The Water District's policy, rationally distinguishing between landlords and tenants, withstands equal protection scrutiny."). In light of Vermont law on this issue,[16] the court does not reject Plaintiffs' equal protection claim simply because the City can point to differences between property owners and tenants. Instead, it analyzes whether those

---

[16] *See Corcoran,* 266 A.2d at 464; *Waldron,* 112 A. at 221; *Hall,* 35 A.2d at 384.

differences matter in the context of the provision of municipal water service. The City contends they do, Plaintiffs contends they do not.

In seeking to distinguish between property owners and tenants, the City repeats its claim that the Disconnect Statute distinguishes between property owners and tenants by equating the term "ratepayer" with "property owner" and thereby authorizing municipalities to deal only with the property owner. The court has rejected the City's interpretation of the Disconnect Statute and concludes that there is no affirmative "authorization" under Vermont law to refuse to deal with tenants in establishing municipal water service merely because they are not property owners.

The City alternatively argues that even if property owners and tenants are similarly situated, it may legislatively determine that it will only "deal" with property owners for purposes of "administrative convenience" and "financial responsibility," because it is allegedly easier to identify property owners based upon the City's land records, and because property owners who have an interest in the property are more likely to pay their water service bill. While these arguments have some superficial appeal, there is scant evidence to support them. The City does not need to identify property owners through the City's land records because it identifies the account holder by the name on the account and the location of the property served. This same process could occur with a tenant establishing service in his or her own name. There is thus no apparent need to resort to the City's land records except in the event of a lien. In that event, regardless of whether the account holder is a tenant or a property owner, Vermont law authorizes a lien on the property served. *See* 24 V.S.A. § 3306.

As for the City's contention that property owners are somehow more invested in the timely payment of water service bills, the facts of Plaintiff Brown's case belie that contention while the facts of Plaintiff Brooks's case seem to support it. On the one hand, property owners presumably have a strong interest in ensuring their property is not encumbered by a municipal water service lien which is subject to foreclosure. On the other hand, when comparing who is more interested in ensuring continued water service, the person who needs that water service for the essential activities of daily living

arguably has a greater interest in its continuation than an absentee landlord. The further argument that only a property owner may reasonably be held financially accountable for a water service bill, if true, would apply with equal force to all forms of utility services, including fuel and electricity, however, providers of those services seem to find no insurmountable obstacles in conditioning service upon provision of a deposit and payment. The City does not contend, nor could it, that it could not establish water accounts in tenants' own names conditioned upon their satisfaction of connection requirements. Rather, it merely contends that it should not be expected to do so at its own expense. (Doc. 110-1 at 37) ("It would be needlessly expensive for the City to install a separate water meter for every single residential unit within City limits when one meter per property is sufficient to accurately measure water usage."). This does not, however, explain a categorical refusal to deal with all tenants. It merely points out some of the burdens the City might reasonably impose on tenants should it change its Ordinance.

The City's insistence that it deals only with the property owner as a matter of appropriate legislative line-drawing is also questionable. The City's Charter authorizes and empowers it to provide water service to "all inhabitants." In addition, the City's alleged strict adherence to a policy of dealing only with property owners is at odds with its acceptance of payment from anyone and its apparent willingness to continue to supply water service on that basis. By conditioning its willingness to "deal" with tenants based upon their willingness to pay their landlords' outstanding arrearages, the City comes perilously close to a practice of conditioning water service based upon the assumption of a third party's debt. *See Walz*, 46 F.3d at 167 ("To be sure, a denial of water supply to one resident while providing it to others in similar circumstances, or, as here, an exacting in the case of one applicant of onerous and extortionate conditions that were unrelated to the merits of the application, might give rise to an Equal Protection claim."). As the City has pointed out, however, the instant case is one in which neither Plaintiffs nor class members can claim "innocent" or "unrelated" status vis-à-vis their landlord's water service arrearages. They thus possess an undeniable relationship to the debt the City

seeks to collect. *See Gunter*, 2011 WL 1225791, at *11 (finding no equal protection violation because, among other things, "defendant's request that plaintiff pay for the arrears on service to the residence was rational in light of the fact that plaintiff was the co-owner and lived at the premises when the arrears accrued.").

The strongest argument that the City makes for treating property owners and tenants differently is that it may more easily and successfully pursue its various collection methods against a landlord whose real property provides security for repayment, than against a tenant whose deposit may not.[17] Plaintiffs fail to establish that this disparity of treatment serves no legitimate governmental purpose. *Heller*, 509 U.S. at 319; *see also Federal Commc'ns Comm'n v. Beach Commc'ns,* 508 U.S. 307, 315 (1993) (The party attacking a classification has the burden "to negative every conceivable basis which might support it.") (citation omitted). The availability of a more effective, fair, or reasonable approach will not satisfy this burden. As the Second Circuit has held:

> We will not strike down a law as irrational simply because it may not succeed in bringing about the result it seeks to accomplish, *Seagram & Sons, Inc. v. Hostetter*, 384 U.S. 35, 50 [ ] (1966), because the problem could have been better addressed in some other way, *Mourning* [v. *Family Publications Serv., Inc.,*] 411 U.S. [356], 378 [(1973)] or because the statute's classifications lack razor-sharp precision, *Dandridge* [v. *Williams*, 397 U.S. 471, 484-]485 [(1970)]. Nor will a statute be overturned on the basis that no empirical evidence supports the assumptions underlying the legislative choice. *Vance* [v. *Bradley*], 440 U.S. [93], 110-11 [(1979)]. To succeed on a claim such as this, 'those challenging the legislative judgment must convince the court that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker." *Id.* at 111 [].
>
> So long as they do not burden fundamental rights or single out suspect classifications, lawmakers are free to engage in "rational speculation unsupported by evidence." *Beach Communications*, 508 U.S. at 315[.]

---

[17] A tenant who has incurred water service arrearages risks losing his or her deposit and facing an unsecured claim for repayment. In contrast, a landlord risks losing his or her real property and facing a secured claim for repayment.

*Beatie*, 123 F.3d at 712. Plaintiffs' arguments regarding how and why the City's refusal to provide water service to tenants should be addressed are thus generally left to the legislative process rather than to the courts. *Id.* (observing that courts must assume that "the democratic process" will eventually remedy "improvident legislative choices" rendering judicial intervention "generally unwarranted[.]").

The City has identified a plausible reason for dealing only with property owners in establishing water service to multi-dwelling unit buildings which furthers a legitimate governmental interest in revenue collection. Plaintiffs have not negated that reason as inconceivable. "Where . . . there are plausible reasons for [legislative] action, our inquiry is at an end." *U.S. R.R. Ret. Bd. v. Fritz*, 449 U.S. 166, 179 (1980). The court is therefore compelled to conclude that the City's Ordinance does not violate the Equal Protection Clause under rational basis review.

For the reasons stated above, the court GRANTS the City's motion for summary judgment regarding Plaintiffs' claim for violation of equal protection (Count Three), and DENIES Plaintiffs' cross-motion for summary judgment regarding the same.

## CONCLUSION

For the foregoing reasons, the court GRANTS in part and DENIES in part the City's motion for summary judgment (Doc. 110) and GRANTS in part and DENIES in part Plaintiffs' cross-motion for summary judgment (Doc. 114).

SO ORDERED.

Dated at Rutland, Vermont in the District of Vermont this 12th day of July, 2012.

Christina Reiss, Chief Judge
United States District Court